UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Nicole KRAUSE-PETTAI, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNILEVER UNITED STATES, INC., et al.,<br><br>Defendants. | Case No.: 20-cv-1672-AGS-BLM<br><br>**ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT (ECF 70) AND TO EXCLUDE EXPERT TESTIMONY (ECF 71 & 72), AND DENYING PLAINTIFF'S CLASS-CERTIFICATION MOTION (ECF 57)** |

This case is about useless empty space, known as "nonfunctional slack fill," inside underarm-deodorant sticks. Defendant argues, among other defenses, that federal law preempts slack-fill suits regarding drugs and cosmetics, a matter of first impression in this Circuit.

## BACKGROUND

In this putative class action, four plaintiffs claim they were duped into buying defendant Unilever's deodorant and antiperspirant. They say the oversized containers create the illusion of holding more than competitors' same-weight items. (ECF 52, at 3, 10–12.) According to plaintiffs, much of Unilever's products' volume is nonfunctional slack fill. (*Id*. at 11–12.) They seek class certification, alleging various unfair and deceptive trade practices under state law. Unilever opposes certification and insists the case should be thrown out on summary-judgment and federal-preemption grounds.

## DISCUSSION

**A.   Preemption**

As a threshold matter, Unilever contends that federal regulations preempt plaintiffs' state-law claims. "[S]tate laws that conflict with federal law are without effect." *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008) (cleaned up); *see also* U.S. Const., art. VI, cl. 2 (Supremacy Clause). "Federal preemption can be either express or implied." *Chicanos*

*Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 863 (9th Cir. 2009). Unilever relies only on the express variety.

### 1. *Express Preemption: The FDCA*

To assure national uniformity, the Food, Drug, and Cosmetic Act expressly preempts any state "requirement" for labeling or packaging cosmetics and nonprescription drugs—including deodorants and antiperspirants—that is "different from or in addition to, or that is otherwise not identical with," federal rules. *See* 21 U.S.C. § 379r(a)(2) (nonprescription drugs); *id.* § 379s(a) (cosmetics). The question is: Do the challenged state laws mandate "requirements" that are (a) "identical with" federal standards or (b) "different from or in addition to" them?

As relevant here, both the FDCA and California's Sherman Food, Drug, and Cosmetic Law set the same baseline requirements for drugs and cosmetics. They deem such an item "misbranded" if "its labeling is false or misleading in any particular" or if its "container" is "filled as to be misleading." *See* 21 U.S.C. § 352(a)(1) (drugs; label); *id.* § 352(i)(1) (drugs; container); *id.* § 362(a) (cosmetics; label); *id.* § 362(d) (cosmetics; container); Cal. Health & Safety Code § 111330 (drugs; label); *id.* § 111390 (drugs; container); *id.* § 111730 (cosmetics; label); *id.* § 111750 (cosmetics; container). Because the Sherman Law's standard "is *identical* to" the FDCA's, it is not preempted. *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016).

But California did not stop at that baseline. It added to it. The FDCA and Sherman Law both generally forbid "misleading" labeling and packaging, but neither addresses slack-fill limits on drugs or cosmetics. Yet the California Fair Packaging and Labeling Act (CFPLA) goes one step farther, condemning any opaque container as "misleading" if "it contains nonfunctional slack fill," with some exceptions. *See* Cal. Bus. & Prof. Code § 12606(b). The Ninth Circuit concluded that this exact regulatory scenario mandated preemption in *Del Real, LLC v. Harris*, 636 F. App'x 956 (9th Cir. 2016). In the context of "meat and poultry products," it held that the CFPLA's "nonfunctional slack fill

provisions" were "in addition to, or different than" the relevant federal statutes' "general prohibitions against containers 'filled as to be misleading.'" *Id*. at 957.

Plaintiffs protest that slack-fill regulations may only be preempted by "an overt decision," not federal "silence" on the issue. (*See* ECF 77, at 15.) But Congress was not silent here; it spoke clearly about what is preempted. In the FDCA, Congress meant to preclude all state requirements that are "different from or in addition to," or "otherwise not identical with," the federal regulatory regime for labeling and packaging drugs and cosmetics. In *National Meat Association v. Harris*, 565 U.S. 452 (2012), the Supreme Court held that a nearly identical preemption provision "sweeps widely" and blocks states from imposing on the federal plan "any additional or different—even if non-conflicting— requirements." *Id*. at 459. Even assuming California's slack-fill regulation doesn't conflict with the federal design, it "plainly *adds* to the regulatory burden faced by a manufacturer" subject to the FDCA's packaging and labeling constraints. *See Del Real, LLC v. Harris*, 966 F. Supp. 2d 1047, 1064 (E.D. Cal. 2013), *aff'd*, 636 F. App'x 956 (9th Cir. 2016). Thus, the CPFLA's slack-fill ban for drugs and cosmetics is preempted.

### 2. *Preemptive Scope*

The foregoing robs plaintiffs of a powerful arrow in their quiver: a per se rule that nonfunctional slack fill is misleading. But it does not necessarily foreclose their claims entirely, as Unilever urges. The FDCA "does not preempt state laws that allow consumers to sue . . . manufacturers that label or package their products *in violation of federal standards*." *See Ebner*, 838 F.3d at 964 (discussing cosmetics). Plaintiffs argue that their state-law claims enforce federal prohibitions on "misleading" packaging. But Unilever insists that, according to the relevant federal agency, slack fill in drugs and cosmetics is never misleading.

For support, Unilever points to two cases that held the Food and Drug Administration's failure to set explicit restrictions on slack fill in drugs and cosmetics is "tantamount to a conscious decision by the agency to permit" it. *See O'Connor v. Henkel Corp.*, No. 14-CV-5547 (ARR)(MDG), 2015 WL 5922183, at *6 (E.D.N.Y. Sept. 22,

2015); *Bimont v. Unilever U.S., Inc.*, No. 14-CV-7749 (JPO), 2015 WL 5256988, at *6 (S.D.N.Y. Sept. 9, 2015). Both opinions quote *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753 (9th Cir. 2015). But *Astiana* made the opposite point. The defense there supposed that "the FDA's failure to issue specific regulations" about the word "'natural' on cosmetics labels" was "tantamount to a conscious decision by the agency to permit any use of this term a manufacturer sees fit." *Id.* at 758. The Ninth Circuit disagreed. It noted that this "argument proves too much," as it would allow a manufacturer to "make any claim—wild, untruthful, or otherwise—about a product whose contents are not addressed by a specific regulation." *Id.* Even without precise federal guidelines, *Astiana* allowed plaintiffs' state-law suit alleging deceptive use of the word "natural" to proceed, as it promoted the general federal prohibition on "false or misleading" labeling. *Id.* at 758–59.

Like *Astiana*, the FDA's failure "to issue specific regulations" about nonfunctional slack fill does not mean manufacturers may make cosmetics with "any" amount of it, even refrigerator-sized deodorant sticks that are 99% empty. Federal statutes, after all, proscribe labeling and container-filling that is "misleading." *See* 21 U.S.C. § 352(a)(1), (i)(1); *id.* § 362(a), (d). So, litigants may bring state claims to vindicate that federal standard on the ground that the degree of slack fill for a drug or cosmetic product renders it misleading. They simply may not rely on California's slack-fill ban to do so.

At any rate, this Court is reluctant to divine broader federal preemption from an agency's choice to forego more detailed regulations. "[M]ere deliberate agency inaction—an agency decision *not* to regulate an issue—will not alone preempt state law." *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 247 (3d Cir. 2008) (analyzing *Sprietsma v. Mercury Marine*, 537 U.S. 51, 67 (2002), and *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495 (1988)).

Regardless, the FDA's refusal to set slack-fill limits in these markets is not akin to blessing limitless slack fill. Congress authorized the FDA to "promulgate regulations" to "prevent the nonfunctional-slack-fill of packages containing," among other things, food, drugs, and cosmetics. 15 U.S.C. § 1454(a) & (c)(4). Yet the FDA chose to set such

4

standards only for food. *See* 21 C.F.R. § 100.100 (defining misbranded food containers). Does this mean it concluded that slack fill was always acceptable in drug and cosmetic products? No. The FDA later explained that "determining maximum allowable levels for functional slack-fill" in these items "would require considerable agency resources" and "would, in *many* cases . . . serve no useful purpose." Misleading Containers; Nonfunctional Slack-Fill, 58 Fed. Reg. 2957, 2960 (Jan. 6, 1993) (emphasis added). In short, the FDA tacitly acknowledged at least some slack-fill problem in the drug and cosmetic marketplace, but it chose to focus its limited resources on food instead. That is a reasonable cost/benefit call, but no basis to preempt all slack-fill lawsuits.[1]

**B.   Expert Testimony**

Before turning to summary judgment, the Court must see if plaintiffs' expert testimony is admissible in that analysis. Unilever moves to exclude the opinions of both experts—Dr. Sher Paul Singh and Dr. Forrest Morgeson III.

The "proponent of the expert" shoulders "the burden of proving admissibility." *United States v. Williams*, 850 F. App'x 566, 567 (9th Cir. 2021). A qualified expert's opinion is admissible when:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] To the extent this Circuit still applies the "presumption against preemption" to express-preemption provisions, that principle offers additional support for confining this Court's preemption ruling to its current bounds. *See California Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1056–62 (9th Cir. 2023) (O'Scannlain, J., concurring) (discussing "the apparently conflicting line of cases" on this issue).

Fed. R. Evid. 702.

The trial court's task is to "ensure that all admitted expert testimony is both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702's first condition—helpfulness to the factfinder—"goes primarily to relevance." *Daubert*, 509 U.S. at 591. As for reliability, scientific evidence passes muster if the expert's "principles and methodology" are "grounded in the methods of science." *Wendell*, 858 F.3d at 1232. The court's inquiry is "flexible," with a "liberal thrust favoring admission." *Id.* (cleaned up). Among other things, courts may look at whether the expert's "theory or technique": (1) "is generally accepted in the scientific community," (2) has "been subjected to peer review and publication, (3) "can be and has been tested," and (4) produces an acceptable "known or potential rate of error." *Id*. Finally, courts consider whether experts' testimony concerns "matters growing naturally out of their own independent research," or if they "developed their opinions expressly for" trial. *Id.*

**1. *Dr. Singh***

Dr. Singh's expert opinion is that "the accused products have approximately 20%-25% less product than the available capacity," which is "purely nonfunctional." (ECF 57-3, at 104.) He also concludes that plaintiffs' allegations against Unilever "are correct and the accused products are deceptive." (*Id*.) With decades of teaching, working, and researching in the packaging industry, Dr. Singh is eminently qualified to offer expert opinions in that field. (*See* ECF 57-3, at 80–84.) Because Unilever does not dispute his qualifications—nor that his knowledge is addressed to relevant topics that may be helpful to a factfinder—the Court will confine its analysis to the remaining contested Rule 702 prerequisites.

   a. *Facts or Data*

There are several grave problems with the facts and data upon which Dr. Singh relies. First, his opinions about the "accused products" seem to be based on testing only two of the three designs. Plaintiffs concede that "only measurements from the Syzygy and

Morpheus designs ended up in the tables" of Dr. Singh's report, but claim that the photographs show he "evaluated all three stick designs." (*See* ECF 79, at 5; ECF 57-3, at 103 fig.17; *id.* at 164.) They say data for the third design—Meteor—was omitted due to a "minor copying error," but have yet to come forward with those numbers. (ECF 79, at 5.)

Second, even among the designs he examined, Dr. Singh "looked at only two different samples" for each kind of deodorant or antiperspirant stick. (ECF 69-10, at 10.) Plaintiffs argue that no more was needed because "each product leaves the manufacturing line with precise weighted measurements." (ECF 79, at 6.) Even so, a sample size of two is a slim statistical reed to support such broad conclusions. *Cf. Pascal v. Nissan N. Am., Inc.*, No. 8:20-cv-00492-JLS-JDE, 2022 WL 19076763, at *10 (C.D. Cal. Dec. 21, 2022) (finding "testing on only four vehicles" was "problematic," but excluding expert on other grounds). Courts nonetheless often admit expert evidence despite "concerns that a survey's sample size is too small or unrepresentative," as this may merely "go to the weight to be accorded the survey results." *Araujo v. Coachella Valley Water Dist.*, No. 20-CV-01800-AJB-RBM, 2022 WL 4181004, at *9 (S.D. Cal. Sept. 12, 2022) (cleaned up). So this concern is not necessarily fatal. But the problems don't end there.

Perhaps the most worrisome blind spot is that the precise number and types of products Dr. Singh tested and examined remains a mystery. He variously testified that he sampled "ten sticks total" (ECF 69-11, at 8); "conducted the tests at two different times," with "ten sticks" one time and "eight sticks" another (*id.* at 15); or "analyzed" about "20, 25" sticks, although that data is "not captured anywhere" in his report (*id.* at 14). The tables in which he summarized his "weight" and "volume" computations don't shed much light on the underlying data. (*See* ECF 57-3, at 103 fig.17; *id.* at 164.) The five brand names he lists could indicate many products of varying formulation, size, and scent. (*Id.* at 103 fig.17.) It is also unclear why there are nine total data rows in his two tables, whether his findings are based only on the five sticks identified in the first table, or if those two tables share overlapping data. (*Compare* ECF 57-3, at 103 fig.17 *with id.* at 164.)

His testimony about the number of product containers "examined" is similarly scattershot, ranging from 30 to 60. (*See* ECF 57-3, at 95 ("over approximately 30 stick deodorant containers"); ECF 69-11, at 12 ("probably . . . 50 to 60 sticks"); *id*. at 13 ("approximately 50 sticks" or "somewhere around 35, 37. I don't know").) Granted, he allowed that his estimate of "50" included "sticks that are not at issue in this case." (ECF 69-11, at 13.)

The fundamental flaw is that there is no written record of Dr. Singh's entire procedure. Rather than writing down each result, he meant for his snapshots of unidentified products next to tape measures to constitute "visible data." (ECF 69-11, at 16; *see also id*. at 16 ("The data is the photograph."); *id*. at 5 ("I don't have the detail.").) But during his deposition he could not recreate the complete dataset, even with photographic aids.

In sum, plaintiffs have not carried their burden of showing that Dr. Singh's opinion is based upon sufficient facts or data.

b. *Methodology and Application*

Dr. Singh's methodology suffers from the same inscrutability and poor documentation as his data. Because he did not transcribe his results—and the photographic record is ambiguous—there is no way to retrace his steps exactly. His methods also fail all the standard reliability considerations. For example, plaintiffs have not shown that they are "generally accepted in the scientific community," have "been subjected to peer review and publication," "can be and [have] been tested," or yield an acceptable error rate. *See Wendell*, 858 F.3d at 1232. And Dr. Singh's opinions were expressly developed for this litigation, at plaintiffs' request. *See id*.; (ECF 57-3, at 80).

The details of Dr. Singh's testing system are somewhat ill-defined. His report describes how he measured the relative heights of each container and its enclosed product to come to a "percentage of slack fill." (ECF 57-3, at 103.) That document also explains that he used an "electronic balance" to weigh the deodorant he "extracted . . . from the container." (ECF 57-3, at 99.) But only his deposition sheds light on how he extricated the product from the casings, with somewhat unpredictable results. Before extraction, he

placed the deodorant "in the freezer for about ten minutes," followed by a "refrigerator" set to about "35 to 45 degree[s]" for an unspecified time. (ECF 69-10, at 5–6.) Some samples "did not come out right"; some "broke." (ECF 69-11, at 13.) Even worse, at times the product got "left in the bottom," and he "could not extract it." (*Id.* at 15.) It is unknown how many deodorant sticks succumbed to these ministrations. And Dr. Singh never clarified how he overcame these practical obstacles nor how he ensured a complete specimen for measurement.

Unilever particularly cries foul over the volume test. Before calculating a deodorant container's space, Unilever says, Dr. Singh inexplicably removed the twist-bottom dispensing "platform and internal components," thereby inflating his "maximum capacity measurements . . . as they fail to account for the volume or space occupied by the components removed." (ECF 71-1, at 12.) Plaintiffs do not respond to this accusation. (*See generally* ECF 79.) Rather, they point out that both sides' "experts found roughly the same amount of total empty space in their analyses." (*Id*. at 6.) But this case is not about "empty space"; it's about *nonfunctional* slack fill. And the calculations of nonfunctional space are wildly at odds: Unilever's expert concludes it's 0%; Dr. Singh says 100%. (*See id*. at 5; ECF 57-3, at 104 (Singh: "purely nonfunctional").)

In any event, it is unclear which brands and stick designs Dr. Singh subjected to this debatable measurement program. But it is plain that no one else could use "the same data and methods" to "replicate the results." *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014) (cleaned up). Plaintiffs have therefore not carried their burden of showing that Dr. Singh's testimony is based on reliable methods or that those methods were reliably applied. Dr. Singh's testimony is excluded.

### 2. Dr. Morgeson

Plaintiffs offer Dr. Morgeson as an expert on consumer-purchasing behavior to opine that: (1) consumers "spend limited time examining package labeling information" and generally "assume that larger packages contain a larger quantity of a product"; (2) "[n]et weight labeling information on product packages is rarely examined (or

understood) by consumers"; and (3) due to these consumer tendencies and "general unfamiliarity with the concept of slack fill, the relevant Unilever product package features suggest" that Unilever consumers got "less product than they might have anticipated." (ECF 57-3, at 59.) Dr. Morgeson is a university professor who teaches "marketing research and marketing management courses." (ECF 57-3, at 57, 65.) He has researched and testified about "customer satisfaction and customer experience measurement and management," including "how they relate to slack-fill." (*Id.* at 58; ECF 80, at 4.) Unilever does not challenge his expert qualifications, but it contests every other step of the Rule 702 analysis.

      a. *Helpfulness to Factfinder*

Although Unilever maintains that Dr. Morgeson's "opinions are not helpful to the trier of fact" (ECF 72-1, at 13), that is not the precise question the Court must answer. The issue is whether the expert's "*knowledge* will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Dr. Morgeson appears to have extensively studied consumer behavior, but his expertise in this field is only relevant if it sheds light on consumer expectations regarding deodorants and antiperspirants. That is, at best, unclear. Even assuming his knowledge is helpful, plaintiffs must prove that his wisdom can be channeled into reliable opinions about Unilever's consumers.

      b. *Facts or Data*

Unilever criticizes Dr. Morgeson for failing to gather any relevant "facts or data," and doing "nothing to study the products at issue." (ECF 72-1, at 8.) Indeed, his discussion of the items here betrays a certain unfamiliarity. Plaintiffs' central allegation is that Unilever's sticks came in "larger packaging" than competitor products, although "the net weight [is] the same." (ECF 52, at 11.) Yet Dr. Morgeson rebuts these foundational points, claiming that Unilever's products "are roughly the *same size* (or larger) than those used by its competitors," but "contain *less* actual product." (ECF 57-3, at 63 (emphasis added).)

He has also apparently never examined the deodorant and antiperspirant market. According to his report, Dr. Morgeson based his opinions on his "review of relevant scientific and academic literature," his "academic research over the past 15 years," two

decades of "experience working with large annual samples of cross-industry consumer survey data and research," and materials provided by plaintiffs' counsel. (ECF 57-3, at 59.) Yet he fails to specify how much of this background touched the pertinent market. He references three academic or industry articles and 13 papers describing original studies, but none concerning the market at hand.

In fact, only two papers extend slightly beyond food and beverages. A 1990 study of grocery-shopping habits considered four products: coffee, margarine, cereal, and toothpaste. *See* Peter R. Dickson & Alan G. Sawyer, *The Price Knowledge and Search of Supermarket Shoppers*, 54 J. Mktg., July 1990, at 42, 46. The results lumped all four items together, so it's impossible to tell if consumers behaved differently with toothpaste than with, say, cereal. *Id*. at 49–51. Similarly, a 2016 Australian grocery study of purchasing speed focused on twelve items, including milk, bananas, yogurt, chocolate bars, pasta sauce, rice, toothpaste, shampoo, and four pet foods. *See* Zachary Anesbury et al., *How Do Shoppers Behave Online? An Observational Study of Online Grocery Shopping*, 15 J. Consumer Behav. 261, 265 (2016). Interestingly, the two non-food items—shampoo and toothpaste—had the longest average selection times, with shoppers spending twice as long choosing shampoo as bananas. *Id*. If anything, these results suggest that food-buying habits don't apply equally to other commodities.

Unilever insists that Dr. Morgeson's opinion is not based on any "empirical study on the relevant [consumer] universe and products." (ECF 72-1, at 9.) Plaintiffs do not say otherwise. The adequacy of this dataset is concerning.

    c.  *Methodology and Application*

With no data points in the relevant market, plaintiffs must shoulder the burden of demonstrating why food consumers (or 1990-era toothpaste shoppers) are apt to behave like deodorant buyers. Or they must at least explain why food-shopping habits can be generalized across all consumables markets. "[W]hile studies involving similar but not identical situations may be helpful, an expert must set forth the steps used to reach the conclusion that the research is applicable." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d

600, 606 (9th Cir. 2002). Without that minimum foundation, Dr. Morgeson could just as easily extrapolate opinions from car-buying research papers.

Plaintiffs respond that "there is no reason to believe that" the studies Dr. Morgeson relied upon "do not still apply to all consumers," including Unilever's customers. (*See* ECF 80, at 6.) But there is also "no reason to believe" that they apply here. The Court need not take Dr. Morgeson's word for it. Nor must it "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *See id.*; *see also Highfields Cap. I, LP v. SeaWorld Entm't, Inc.*, No. 18-CV-1276-MMA (AGS), 2022 WL 1037210, at *16, 18 (S.D. Cal. Apr. 6, 2022) (excluding expert who "merely reviewed statements, documents, testimony, and outside articles," but applied "no scientific or methodological analysis of any data" to form his opinions). Dr. Morgeson's testimony, like Dr. Singh's, is excluded.

## C. Summary Judgment

That leaves Unilever's summary-judgment motion. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the facts and draw all reasonable inferences "in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).

Plaintiffs bring three claims based on California consumer-protection statutes: the Consumers Legal Remedies Act (claim 1), False Advertising Law (claim 2), and Unfair Competition Law (claim 3). They also allege common-law claims for negligent misrepresentation (claim 4) and fraud and deceit (claim 5). The statutory claims may generally be considered "together," with one caveat. *See In re ConAgra Foods, Inc.*,

90 F. Supp. 3d 919, 982 (C.D. Cal. 2015). Under the Unfair Competition Law, plaintiffs allege that Unilever engaged in "unfair, unlawful, [and] fraudulent business acts and practices." (ECF 52, at 23.) Each of these UCL prongs—"unfair," "unlawful," and "fraudulent"—is "a separate and distinct theory of liability." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). But when the factual bases for the unfair and fraudulent versions "overlap entirely," as here, their fates merge. *See Sue Shin v. Campbell Soup Co.*, No. CV 17-1082-DMG (JCx), 2017 WL 3534991, at *7–8 (C.D. Cal. Aug. 9, 2017). Because the UCL's unlawful prong raises distinct legal issues, however, the Court will address it separately from the other statutory claims.

### 1. *Claims Subject to the Reasonable-Consumer Test*

The first four causes of action—excepting the UCL's unlawful prong—rise and fall together, as they "are governed by the 'reasonable consumer' test." *See Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (CLRA, FAL, and UCL's fraudulent prong); *see also Girard v. Toyota Motor Sales, U.S.A., Inc.*, 316 F. App'x 561, 562 (9th Cir. 2008) (negligent misrepresentation). Under this test, plaintiffs must prove that "members of the public are likely to be deceived." *Id*. Put another way, they must show "that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Lavie v. Procter & Gamble Co.*, 129 Cal. Rptr. 2d 486, 495 (Ct. App. 2003).

"Surveys and expert testimony" are "not required" to satisfy the reasonable-consumer test, but a "few isolated examples of actual deception are insufficient." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008) (cleaned up). In fact, as many as seven "Plaintiffs' deposition testimonies" have failed to meet this standard, when unaccompanied by other pertinent evidence of deception. *See In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, No. ML132438PSGPLAX, 2018 WL 11354864, at *7 (C.D. Cal. Jan. 24, 2018). By contrast, the testimony of even a single individual may suffice if paired with patently false marketing or relevant extrinsic evidence. *See, e.g.*, *Hawkins v. Kroger Co.*, 512 F. Supp. 3d 1079, 1088–89 (S.D. Cal. 2021) (holding that plaintiff's testimony,

"the '0g Trans Fat' label," and defendant's "admission" that the product "contained some trans fat" were sufficient without other "extrinsic evidence"); *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 891 (N.D. Cal. 2016) (concluding that "three types of evidence"—plaintiff's testimony, "marketing research surveys," and the name "*Joint Juice*"—showed that reasonable consumers would likely "buy the product to relieve joint pain").

With all their expert testimony now excluded, the four plaintiffs must depend on their own anecdotal accounts of deception. All four testified that Unilever's packaging tricked "them into thinking they were getting more product than they were." (ECF 52, at 11; *see, e.g.*, ECF 57-4, at 2 (Nicole Krause-Pettai); ECF 77-7, at 7 (Christy Stevens Botto); ECF 77-8, at 10 (Kevin Bolden); ECF 57-6, at 3 (Errol Carreon).)

Yet plaintiffs have little else to work with. This case does not have patently false marketing like *Hawkins*, which involved a product with "some trans fat" bearing a "'0g Trans Fat' label." *See Hawkins*, 512 F. Supp. 3d at 1088–89. To the contrary, each plaintiff here is aware that every Unilever product is labeled with its actual net weight, which can be used for value comparisons. (ECF 69-5, at 13–15 (Krause-Pettai); ECF 77-7, at 11 (Botto); ECF 69-7, at 37–38 (Bolden); ECF 69-8, at 13 (Carreon).) Nor do plaintiffs have "marketing research surveys" or other evidence to corroborate their anecdotal claims. *See Mullins*, 178 F. Supp. 3d at 891.

With so little positive proof, plaintiffs cannot make their case. And that's before taking stock of the countervailing evidence that undercuts their theory of deception. First, plaintiffs offer no comparative evidence to corroborate their claims that Unilever is an outlier and that its competitors suffer lost sales due to their more aboveboard packaging. *See Bruton v. Gerber Products Co.*, 703 F. App'x 468, 471 (9th Cir. 2017) (finding that because competitors' labels "make many of the same illegal claims . . . [a] reasonable jury comparing the labels side by side could not rationally conclude [defendant's] labels were likely to deceive"). By contrast, the defense introduced compelling comparative evidence that Unilever's "Dove and Degree sticks are generally in line with competing products."

14

(ECF 69-3, at 20.) For women's antiperspirants, for instance, the Degree model is nearly the same *overall* height as the competing Secret brand, but it has *less* opaque height than the competitor. (*See id.*) This is because the Degree stick's bottom is translucent (revealing some slack fill), whereas the competitor's is not. (*See id.*) The same is true for women's deodorants. (*See id.* at 21.) And Unilever's Dove and Degree brands stand out even less in the men's categories. Indeed, they appear about the same height as—or shorter than—their competitors. (*See id.* at 22–23.)

Second, plaintiffs have not persuasively refuted Unilever's evidence that "from 2016 to 2022, there were *zero* complaints from California consumers concerning the empty space in the products at issue." (ECF 69-4, at 37.) After all, a "lack of complaints and returns" is "highly relevant" to rebutting a misrepresentation claim. *See Consumer Advocs. v. Echostar Satellite Corp.*, 8 Cal. Rptr. 3d 22, 30 (Ct. App. 2003). Plaintiffs rejoin that this is a "hidden practice" that is "essentially impossible to discover[]," let alone complain about. (ECF 77, at 5, 16.) Yet all four plaintiffs became suspicious because Unilever's sticks seemed top-heavy. (*See* ECF 69-5, at 10 (Krause-Pettai); ECF 69-6, at 28 (Botto); ECF 69-7, at 40 (Bolden); ECF 69-8, at 27 (Carreon)). Surely this observation wasn't unique to them. After millions of sales, a reasonable factfinder might expect more than "zero" complaints from a consuming public that truly felt deceived.

Finally, plaintiffs have little answer to Unilever's expert testimony that any "slack-fill in the sticks at issue is functional." (*See* ECF 69-2, at 46; *see also id.* at 42 ("purely functional").) That expert cogently explained this functionality. (*See id.* at 43–45; ECF 70-1, at 23–26.) Plaintiffs reply with some purported comparative evidence: Unilever's Axe brand products are filled on the same assembly lines, yet allegedly "contain a higher proportion of product to empty space" than the accused products. (ECF 79, at 5; *see also* ECF 77, at 18.) But Dr. Singh's testimony—including his questionable Axe measurements—is now excluded and cannot support this argument. Even if allowed, though, this evidence cuts both ways. If excessive slack fill offers some market advantage,

as plaintiffs claim, they must explain why Unilever would deliberately handicap one of its own product lines by giving it less slack fill.

Even viewing the evidence in the light most favorable to plaintiffs, they cannot show that the general consuming public and targeted consumers would be misled. So there is no genuine dispute as to the material facts regarding negligent misrepresentation and the claims under the CLRA, FAL, and the UCL's fraudulent and unfair prongs. The Court grants summary judgment for Unilever accordingly.

### 2. Other Claims

The above reasonable-consumer analysis is the legal domino that largely topples the remaining causes of action. The fraud-and-deceit claim's elements are even more demanding than the reasonable-consumer test. Among other things, plaintiffs must prove that the labeling or packaging here was "actually false." *See Nacarino v. KSF Acquisition Corp.*, 642 F. Supp. 3d 1074, 1087 (N.D. Cal. 2022). As they have not shown it was even misleading, it isn't false. The UCL unlawful-prong cause of action suffers a similar fate, as it requires the "violation of another law." *See Berryman v. Merit Prop. Mgmt., Inc.*, 62 Cal. Rptr. 3d 177, 186 (Ct. App. 2007). Because the Court has rejected all plaintiffs' theories of predicate illegality—including those based on consumer expectations—the unlawful-prong claim cannot stand.

Thus, the Court grants summary judgment for Unilever on all claims.

## CONCLUSION

Unilever's motions for summary judgment and to exclude expert testimony are **GRANTED**. Plaintiffs' class-certification motion is **DENIED AS MOOT**. The Clerk is directed to close this case.

Dated: September 30, 2023

_____
Hon. Andrew G. Schopler
United States District Judge